THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. DARREN MONTES DE OCA, *Defendant*. | No. 24 CR 527 <br><br> Chief Judge Virginia M. Kendall |

## MEMORANDUM OPINION & ORDER

On November 13, 2024, Darren Montes de Oca was charged with conspiracy to possess with the intent to distribute and to distribute cocaine in violation of 21 U.S.C. § 846, possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug trafficking crime in violation of 21 U.S.C. § 942(c)(1)(A). (Dkt. 1). Montes de Oca now moves to suppress the firearm and cocaine recovered from his vehicle and statements he made to officers (Dkt. 29 at 1). For the following reasons, Montes de Oca's Motion to Suppress [29] is denied.

## BACKGROUND

The following facts are not in dispute. Task Force Officers and Agents from the Federal Bureau of Investigation ("FBI") were investigating a cocaine broker based in Mexico utilizing a confidential human source ("CHS"). (Dkt. 33 at 2). The CHS agreed to cooperate with the FBI to avoid charges or obtain leniency in connection with a separate money laundering investigation. (Dkt. 33 at 2, n. 1). The CHS was later provided monetary compensation by the FBI for their cooperation with the drug investigation. (*Id.*). The CHS knew the cocaine broker was involved in

1

drug trafficking and money laundering because the CHS had participated in these activities prior to their cooperation with the FBI. (Dkt. 33 at 2). The CHS informed the FBI that the broker could arrange for deliveries of cocaine in the United State. (*Id.*).

In June 2024, at the direction of FBI agents, the CHS contacted the broker on a social media application and arranged a delivery of two kilograms of cocaine to take place in the Chicago area. (Dkt. 29 at 3); (Dkt. 33 at 3). The CHS told law enforcement that the broker would share the CHS's phone number with a local courier. (Dkt. 29 at 3). That same day, a phone number eventually linked to Montes de Oca contacted the CHS and agreed to meet at the Walmart parking lot in Lockport, Illinois, at 10:00 a.m. on June 11, 2024. (*Id.*).

At around 10:00 a.m. on June 11, 2024, the CHS received two text messages from Montes de Oca stating that Montes de Oca would be in "an Old Red Ford Escape" and was "Parked in Row 7." (Dkt. 29 at 3); (Dkt. 30, Ex. C). The CHS met with the FBI that morning and informed the agents of the text messages. (Dkt. 33 at 3). Officers and agents began surveillance at the Walmart parking lot and, at 10:05 a.m., observed a red Ford Escape parked in the seventh row. (Dkt. 29 at at 4); (Dkt. 33 at 3). The agents approached the vehicle and observed Montes de Oca in the driver's seat and a female passenger in the front passenger seat. (Dkt. 29 at 4). The vehicle's make, model, and location were consistent with the information provided by the CHS. (Dkt. 33 at 4). Law enforcement directed both occupants to exit the vehicle and detained them. (Dkt. 29 at 4); (Dkt. 33 at 4). Montes de Oca was handcuffed. (Dkt. 29 at 4). The agents then conducted a search of the vehicle and recovered a red bag from the rear passenger seat containing approximately two kilograms of a substance later identified as cocaine. (*Id*). After recovering the cocaine, an agent asked Montes de Oca whether there were any weapons in the vehicle, and he answered affirmatively. (*Id.*). A firearm was subsequently recovered from the driver's side door. (*Id.*)

2

Montes de Oca was transported to the Lockport Police Department, where he was interviewed by law enforcement. (Dkt. 29 at 5); (Dkt. 33 at 4). During the interview, he was advised of his *Miranda* rights. (Dkt. 33 at 4). Statements made during this interview led to the discovery of an additional five kilograms of cocaine. (Dkt. 29 at 5). Montes de Oca now moves to suppress the firearm and cocaine recovered by the officers and all post-seizure statements as the products of an unlawful search and seizure. (Dkt. 29 at 2). He also seeks an evidentiary hearing. (*Id.*).

## DISCUSSION

### I. Evidentiary Hearing

Montes de Oca requests an evidentiary hearing to "develop a record on the reliability" of communications between the CHS and the broker. (Dkt. 29 at 9). Montes de Oca argues that an evidentiary hearing is warranted given that the Government does not have copies of the CHS's communications with the broker and that the CHS's reliability is "at the crux" of the Government's probable cause arguments. (Dkt. 34 at 11).

While a district court may hold an evidentiary hearing to fill gaps in the record, it is not required to do so. *United States v. Dixon*, 137 F.4th 592, 610 (7th Cir. 2025). The court is required to conduct an evidentiary hearing only when "a substantial claim is presented" and "there are disputed issues of material fact that will affect the outcome of the motion." *United States v. Edgeworth*, 889 F.3d 350, 353 (7th Cir. 2018) (quoting *United States v. Curlin*, 638 F.3d 562, 564 (7th Cir. 2011)). The defendant's "allegations and moving papers must be 'sufficiently definite, specific, non-conjectural and detailed'" to show that there are material factual disputes. *Curlin*, 638 F.3d at 564 (quoting *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007)). Generally, to sufficiently allege a material factual dispute, a defendant must present testimony,

either personal or from other witnesses, or submit evidence that directly challenges the Government's version of events. *United States v. Dortch*, 342 F. Supp. 3d 810, 814 (N.D. Ill. 2018).

Without asserting an affirmative fact that would put probable cause in dispute, Defendant instead asserts that there should be an evidentiary hearing so that Court "may fully evaluate the probable cause issue." (Dkt. 34 at 5). The existence of probable cause is a purely legal determination that does not require factual development through an evidentiary hearing. *United States v. Brown*, 483 F. App'x 289, 292 (7th Cir. 2012). Yet, the details of the search and seizure and of the investigation leading up to it are documented in the evidence submitted by Defendant: an FBI report documenting the CHS's communications with the broker and Defendant; a report from the United States Drug Enforcement Administration detailing the events before, during, and after the search and seizure; and a screenshot of Defendant's text messages with the CHS. (Dkt. 29, Ex. 1); Dkt. 30, Exs. 1-3). Montes de Oca concedes that there is no dispute over the factual assertions laid out in his declaration. (Dkt. 34 at 10). The other evidence he submitted aligns with the Government's version of events. (Dkt. 33 at 1-4). Nor does Defendant dispute the substance of the CHS's communications with the broker described in the FBI report; rather, he merely asserts that the Government does not have copies of the communications. Although he alleges that there may be an issue regarding the informant's reliability which would trigger further inquiry, he fails to dispute any material fact about the CHS's background and his history with the FBI. (Dkt. 29 at 9); (Dkt. 34 at 10-11). This type of conjecture does not warrant an evidentiary hearing. *Dortch*, 342 F. Supp. 3d at 815. "A defendant is not entitled to an evidentiary hearing to determine *if* there is a fact dispute; rather, a defendant must show that a material fact dispute exists to obtain an

4

evidentiary hearing." *Id.* (emphasis in original). Accordingly, the Court denies Montes de Oca's request for an evidentiary hearing.

**II.     Motion to Suppress**

Montes de Oca argues the search of his vehicle and seizure of the firearm and cocaine violated the Fourth Amendment prohibition against illegal searches and seizures. The Government asserts that Defendant's motion should be denied because the search of his vehicle was lawful under the automobile exception to the Fourth Amendment. "Warrantless searches are per se unreasonable under the Fourth Amendment, subject to only certain exceptions." *United States v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020) (citing *Arizona v. Gant*, 556 U.S. 332, 338 (2009)). The automobile exception provides for warrantless searches when officers have probable cause to believe that the vehicle "contains evidence of criminal activity." *United States v. Edwards,* 769 F.3d 509, 514 (7th Cir. 2014); *Carroll v. United States*, 267 U.S. 132, 153 (1925). When probable cause exists to search a vehicle, the authority to search "encompasses any area of the vehicle where evidence of the crime might be found," including "containers within the vehicle that could hold such evidence." *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015).

The parties dispute whether the Government had probable cause to search Montes de Oca's vehicle. Probable cause exists when, based on the totality of the circumstances, there is a fair probability that a search will uncover contraband or evidence of a crime. *United States v. Thompson*, 801 F.3d 845, 847 (7th Cir. 2015) (citing *Illinois v. Gates,* 462 U.S. 213, 238 (1983)). Here, the question is whether there was "a fair probability" that contraband or evidence of a crime would be found in Montes de Oca's Ford Escape; absolute certainty of such a discovery is not required. *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010). Further, "a determination of probable cause is based on probabilities and does not require evidence sufficient to support a

conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Bullock*, 632 F.3d 1004, 1022 (7th Cir. 2011) (internal citations omitted).

First, Montes de Oca argues that the officers did not have probable cause to search his vehicle because they did not observe him committing any offense and did not have knowledge that he was involved with narcotics trafficking. (Dkt. 29 at 7-10). Somehow dismissing the reports of interview, the text messages, and their own surveillance, Defendant claims the FBI had no knowledge that a drug transaction was about to occur. Such facts are not required because probable cause is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Florida v. Harris*, 568 U.S. 237, 243 (2013). The FBI is allowed to establish probable cause based on information from an informant so long as the informant is reliable. *United States v. Eiland*, 71 F. App'x 584, 586–87 (7th Cir. 2003). When assessing the reliability of an informant, courts consider several factors, including whether the informant (1) possessed firsthand knowledge; (2) provided sufficient details to law enforcement; and (3) relayed information that was later corroborated. *United States v. Farmer*, 543 F.3d 363, 377 (7th Cir. 2008). Courts may also consider an informant's past reliability, their reputation for honesty, and their potential motive. *United States v. Cherry*, 920 F.3d 1126, 1133 (7th Cir. 2019) (citing *Gates*, 462 U.S. at 234-35). An informant's admission of culpability is also an indication of veracity. *United States v. Cruz-Rea*, 626 F.3d 929, 939 (7th Cir. 2010). No single factor is dispositive, and "a deficiency in one factor may be compensated for by a strong showing in another or by some other indication of reliability." *Id.* (citing *Gates*, 462 U.S. at 233).

Here, the CHS's statements to the FBI and DEA established probable cause that Montes de Oca came to deliver drugs as part of a transaction. This information was corroborated by the car arriving at the time and place that were shown to the officers in the text messages. It was further corroborated by the vehicle description and occupants arriving at the correct time and place. There was probable cause to believe that there would be evidence of the drug transaction contained in the car. Further, the CHS's inculpatory statements and cooperation with law enforcement throughout the investigation along with the agents' later corroboration of the CHS's information established their reliability despite their motive to obtain leniency and their lack of history of cooperating with law enforcement.

The CHS agreed to cooperate with law enforcement after being approached in connection with a money laundering investigation and agreed to assist with the hope of obtaining leniency. (Dkt. 33 at 2, n. 1). The CHS also provided inculpatory information that they had participated in drug trafficking and money laundering with the narcotics broker. (Dkt. 33 at 2). There are no facts indicating that the CHS previously provided the Government with information. Contrary to Montes de Oca's arguments, however, the CHS's incentives to cooperate with law enforcement and lack of previous corroboration do not preclude the existence of probable cause given their inculpatory statements and later-corroborated information. *See, e.g., United States v. Washburn*, 383 F.3d 638, 642 (7th Cir. 2004) (informant's inculpatory statements and officer's corroboration of his information established probable cause despite informant's possible motive for leniency and status as first-time informant); *United States v. Cruz-Rea*, 626 F.3d 929, 940 (7th Cir. 2010) (informant's admission of culpability and corroboration of their story provided officers with probable cause even though informant had never provided information to law enforcement before). Moreover, an informant's potential motive to obtain leniency does not make their information inherently

unreliable. *See United States v. Mitten*, 592 F.3d 767, 774 (7th Cir. 2010). As the Government points out, informants seeking leniency or other benefits from the police are likely to have a strong incentive to provide accurate and specific information. *United States v. Olson,* 408 F.3d 366, 371 (7th Cir. 2005) ("A motive to curry favor, however, does not necessarily render an informant unreliable.").

Further, the CHS's credibility was confirmed when the officers and agents watched the events the CHS predicted unfold. After the CHS facilitated a drug transaction with the broker at the request of the FBI, the broker informed them that a local courier would be reaching out to execute the drug transaction. (Dkt. 29 at 3). The CHS then showed the agents messages from a number the agents later confirmed to belong to Montes de Oca indicating that he would arrive in the Walmart parking lot in a red Ford Escape at 10:00 a.m. on June 11, 2024 and park in the seventh row. (Dkt. 29 at 3); (Dkt. 33 at 3). The officers and agents observed Montes de Oca do exactly this while surveilling the parking lot at the specified time. (Dkt. 29 at at 4); (Dkt. 33 at 3). The officers' corroboration of the CHS's information regarding the future actions of Montes de Oca further establishes the CHS's reliability. *See, e.g., Washburn*, 383 F.3d at 638; *United States v. Reaves*, 796 F.3d 738, 742 (7th Cir. 2015); *United States v. Rosario*, 234 F.3d 347, 351 (7th Cir. 2000). *See also Cherry*, 920 F.3d at 1134 ("The ability of an informant to predict future actions of others with specificity is one indicator of reliability.") (citing *Gates*, 462 U.S. at 245–46).

Montes de Oca argues that the CHS's information, even if corroborated, did not support probable cause because the communications between him and the CHS did not reference any narcotics; they only suggested a meeting was to take place, not necessarily a drug transaction. (Dkt. 34 at 8). He takes issue with the Government's reliance on *Draper* and *Cherry* because, he argues, the informants in those cases told law enforcement that the defendants were engaged in

8

drug trafficking activities. *See Draper v. United States*, 358 U.S. 307, 309 (1959) (informant told officers that defendant would be returning to Denver with heroin); *Cherry*, 920 F.3d at 1130 (informant told law enforcement that defendant was a gang member and trafficked drugs). These cases, however, do not negate the existence of probable cause here. The officer's corroboration of the innocuous information provided by the CHS that Montes de Oca would show up at particular place at a particular time lends credibility to the unverified information that Montes de Oca was there to engage in criminal activity. *Alabama v. White*, 496 U.S. 325, 331 (1990) (explaining that an informant who "is shown to be right about some things" is "probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity"); *see also United States v. Anglin,* 626 F. App'x 181, 185 (7th Cir. 2015). Further, the CHS personally arranged the sale of the cocaine with the narcotics broker and was contacted by Montes de Oca after the broker stated that a local courier would be reaching out to facilitate the sale. Probable cause is a common-sense determination, measured under a reasonableness standard. *D.Z. v. Buell*, 796 F.3d 749, 755 (7th Cir. 2015). It is reasonable for an officer to believe, given these facts, that Montes de Oca was involved in narcotics trafficking with the broker.

Montes de Oca is correct that "the factual context matters" in making a probable cause determination. (Dkt. 34 at 9). "There is no formula for determining the requisite degree of reliability of an informant's tip that will provide probable cause to arrest." *Cherry*, 920 F.3d at 1135. Under these circumstances, the information from the CHS gave the agents and officers probable cause to believe Montes de Oca's vehicle contained evidence of criminal activity.

Montes de Oca raises additional arguments relating to the search incident to arrest exception. (Dkt. 29 at 10-11). The Court need not address these arguments since the Government

relies solely on the automobile exception, and the Court has determined that exception applies here.

## CONCLUSION

For the foregoing reasons, the Court concludes that the search of Montes de Oca's vehicle and subsequent seizure of evidence was lawful under the Fourth Amendment. Montes de Oca's Motion to Suppress [29] is therefore denied.

Virginia M. Kendall
United States District Judge

Date: November 6, 2025